STATE OF NORTH CAROLINA v. KAREEM MICHAEL LAMONT ALLEN

No. COA09-344

(Filed 3 November 2009)

**1. Confessions and Incriminating Statements— motion to suppress—statements at hospital**

The trial court did not err in a second-degree murder case by denying defendant's motion to suppress his statement to police at a hospital. Defendant was not subjected to a custodial interrogation since the atmosphere and physical surroundings during the questioning manifested a lack of restraint or compulsion and any restraint on defendant's movement was due to his medical treatment and not the actions of the police officers.

**2. Confessions and Incriminating Statements— motion to suppress—statements at police station**

The trial court did not err in a second-degree murder case by denying defendant's motion to suppress his statement because merely stating the charges brought against a defendant is

not an interrogation and defendant initiated the communication with the detective.

### 3. Criminal Law— instructions—flight

The trial court did not err in a second-degree murder case by instructing the jury on flight because the evidence was sufficient to support the theory that defendant fled the scene to avoid apprehension. Even assuming *arguendo* there was insufficient evidence to support a flight instruction, defendant failed to show prejudice in light of the overwhelming evidence presented at trial that defendant was the perpetrator.

### 4. Sentencing— presumptive range—findings of aggravation and mitigation not required

The trial court did not err in a second-degree murder case by allegedly considering the fact that defendant rejected a plea offer when determining his sentence because the trial court did not make any comments pertaining to defendant's rejection of the plea offer and defendant's sentence in the presumptive range is presumed valid.

Appeal by defendant from judgment entered 9 September 2008 by Judge W. Allen Cobb in New Hanover County Superior Court. Heard in the Court of Appeals 16 September 2009.

*Attorney General Roy Cooper, by Special Deputy Attorney General R. Marcus Lodge, for the State.*

*Kathryn L. VandenBerg, for defendant-appellant.*

STEELMAN, Judge.

Where the trial court's findings of fact support its conclusion of law that defendant was not in custody when he was treated in the hospital and answered questions posed by officers investigating the dispute in which he had been involved, the trial court properly denied his motion to suppress the statements. Where an officer merely stated the charges being brought against defendant after he had invoked his constitutional right to counsel, it is not an "interrogation" and the trial court properly denied defendant's motion to suppress any volunteered statements by defendant. Where there was some evidence in the record supporting the theory that defendant fled the scene after a deadly altercation, the trial court did not err in instructing the jury on flight. Defendant failed to show that the trial court

considered that he rejected a plea offer from the State in imposing a presumptive range sentence.

## I. Factual and Procedural Background

At approximately 2:00 p.m. on 26 July 2006, Kareem Allen (defendant) met Ian Franks (Franks) on the corner of 11th and Meares Streets in Wilmington, North Carolina and went to the back seat of Franks's vehicle. Defendant inquired into the whereabouts of the CDs and DVD he had left in Franks's vehicle the previous day. Franks responded, "they should be in here where you left them[.]" Defendant asked Franks to drop him off on "12th and Wright." Franks complied with defendant's request and defendant exited the vehicle. Franks threw defendant's CDs that were in his vehicle on the ground and drove away.

At approximately 2:30 p.m., defendant walked to a convenience store and called Franks two or three times. Defendant asked Franks to meet him at the store so the two could fight. As defendant waited for Franks to arrive for approximately twenty minutes, he drank two energy drinks and did pushups to "pump himself up for fighting[.]" When Franks arrived at the convenience store, defendant demanded "Where['s] my CD at?'" Franks responded that he was not responsible for anything defendant had left in his car, but offered to pay for the missing CD and DVD. Defendant reached into Franks's vehicle to retrieve a $20.00 bill and Franks "started swinging[.]" Defendant pushed Franks back and Franks stabbed him twice in the arm with a knife. Franks exited his vehicle and ran away.

Defendant chased Franks, and grabbed his shirt with his left hand and stabbed Franks in the back. Franks spun around and the two started "tussling." Franks was stabbed three more times. Defendant dropped his knife and ran down the street. Franks ran into the convenience store and collapsed. The store clerk called 911 and performed CPR. Paramedics arrived and could not detect a pulse. Franks was transported to New Hanover Regional Medical Center by ambulance and the Center's trauma team attempted to resuscitate him. Franks died from the injuries inflicted by defendant. An autopsy revealed that Franks had three superficial stab wounds to his chest and back and one fatal stab wound that perforated his heart.

Defendant ran towards 7th Street. He spotted his friend Gerric and got into his vehicle. They saw the vehicle of defendant's mother, and flagged her down. His mother drove him to the New Hanover Regional Medical Center emergency room.

Officer Sean Smith (Officer Smith) of the Wilmington Police Department heard about the incident and the description of the suspect over the radio. Officer Smith and his partner believed defendant fit the description and attempted to find his mother, Latonya Allen (Allen). Officer Smith visited Allen's workplace and left a business card for her with his mobile telephone number. Shortly thereafter, Allen called Officer Smith and told him that they were at the emergency room because defendant had been cut. Officer Smith met Allen at the hospital and she led him to the holding area where defendant was being treated. Officer Smith asked defendant what had happened. Defendant initially responded that he had been in a fight over a DVD and had been stabbed. Other officers arrived at the hospital. Upon defendant's discharge from the hospital, Officer Smith transported him to the police station. Defendant gave a statement to police detailing the altercation.

On 27 November 2006, defendant was indicted for second degree murder. Prior to trial on 23 April 2008, defendant filed two separate motions to suppress his statements made to officers at the hospital and at the police station. Following a two-day suppression hearing before the Honorable Charles H. Henry, these motions were denied. On 9 September 2008, a jury found defendant guilty of second degree murder. The trial court found defendant to be a prior record level IV for felony sentencing purposes and sentenced defendant to an active prison term of 240 to 297 months. Defendant appeals.

## II. Motions to Suppress

### A. Standard of Review

The standard of review of a denial of a motion to suppress is well-established:

> On review of a motion to suppress evidence, an appellate court determines whether the trial court's findings of fact are supported by the evidence and whether the findings of fact support the conclusions of law. The trial court's findings of fact "are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting." The conclusions of law, however, are reviewed de novo.

*State v. Haislip*, 362 N.C. 499, 499-500, 666 S.E.2d 757, 758 (2008) (internal citation and quotation omitted). Where a defendant fails to challenge any of the trial court's findings of fact relating to the motion, our review is limited to whether the trial court's findings

of fact support its conclusions of law. *State v. Cheek*, 351 N.C. 48, 63, 520 S.E.2d 545, 554 (1999), *cert. denied*, 530 U.S. 1245, 147 L. Ed. 2d 965 (2000).

## B. Hospital Statement

**[1]** In his first argument, defendant contends the trial court erred by denying his motion to suppress his statement to police at the hospital arguing that he was subjected to a custodial interrogation and had not been advised of his *Miranda* rights. We disagree.

"[F]ailure to administer *Miranda* warnings in 'custodial situations' creates a presumption of compulsion which would exclude statements of a defendant. Therefore, the initial inquiry in determining whether *Miranda* warnings were required is whether an individual was 'in custody.'" *State v. Buchanan*, 353 N.C. 332, 336-37, 543 S.E.2d 823, 826 (2001) (internal citation omitted). "[I]n determining whether a suspect was in custody, an appellate court must examine all the circumstances surrounding the interrogation; but the definitive inquiry is whether there was a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest." *State v. Gaines*, 345 N.C. 647, 662, 483 S.E.2d 396, 405 (citation omitted), *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997). This determination is based upon "the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *State v. Garcia*, 358 N.C. 382, 396, 597 S.E.2d 724, 736 (2004) (quotation omitted), *cert. denied*, 543 U.S. 1156, 161 L. Ed. 2d 122 (2005). Our analysis focuses upon whether a reasonable person in defendant's position would believe that they were under arrest or significantly restrained in their movement. *Id.*

Defendant only challenges a portion of two of the trial court's findings of fact: (1) that Officer Smith did not attempt to place defendant in custody and (2) that when speaking with Detective Craig at the hospital, defendant "had not been arrested and was not in custody." Although the trial court made "findings" that defendant was not in custody when he was questioned at the hospital, these are actually conclusions of law, which are reviewed *de novo*. *State v. Kemmerlin*, 356 N.C. 446, 456, 573 S.E.2d 870, 880 (2002).

This Court has previously addressed the issue of whether a defendant was in custody while being treated at a hospital. *See e.g.*, *State v. Fuller*, 166 N.C. App. 548, 603 S.E.2d 569 (2004); *State v. Patterson*, 146 N.C. App. 113, 552 S.E.2d 246, *disc. review denied*, 354 N.C. 578, 559 S.E.2d 549 (2001); *State v. Gwaltney*, 31 N.C. App. 240,

228 S.E.2d 764, *disc. review denied and appeal dismissed,* 291 N.C. 449, 230 S.E.2d 767 (1976); *State v. Thomas,* 22 N.C. App. 206, 206 S.E.2d 390, *appeal dismissed,* 285 N.C. 763, 209 S.E.2d 287 (1974). Factors to be considered in whether the questioning of a defendant in a hospital constituted a custodial interrogation include: (1) whether the defendant was free to go at his pleasure; (2) whether the defendant was coherent in thought and speech, and not under the influence of drugs or alcohol; and (3) whether officers intended to arrest the defendant. *Fuller,* 166 N.C. App. at 557, 603 S.E.2d at 576 (citing *Thomas,* 22 N.C. App. at 210, 206 S.E.2d at 392)). This Court has also made a distinction between questioning that is accusatory and that which is investigatory. *Gwaltney,* 31 N.C. App. at 242, 228 S.E.2d at 765; *see also Buchanan,* 353 N.C. at 337, 543 S.E.2d at 827 ("[P]olice officers are not required to administer *Miranda* warnings to everyone whom they question." (quotation omitted) (emphasis added)).

In the instant case, the evidence presented at the suppression hearing tends to show that defendant's mother informed Officer Smith that defendant was in the emergency room because he had been cut. Officer Smith and his partner were the first officers to arrive at the hospital. Officer Smith spoke to defendant to find out "what happened." At that time, Officer Smith did not know the reason for the fight. Defendant could understand Officer Smith and spoke clearly. Detective Craig subsequently arrived at the hospital with the knowledge that two persons were involved in an altercation, and that one individual was in the operating room and the other was in the emergency room. Detective Craig spoke to defendant about what had happened intermittently for about forty minutes. Detective Craig would periodically stop the conversation and leave the area so that medical personnel could treat defendant. Detective Craig's purpose in questioning defendant was to find out "what had happened out there."

Defendant advised Detective Craig that he and Franks had been involved in an argument over some CDs and a DVD movie, and as a result Franks pulled a knife on defendant and cut his wrist and arm. Defendant further stated that he stabbed Franks in retaliation. During these discussions, defendant was not under the influence of drugs or alcohol and clearly understood the questions being asked. Defendant did not cry out in pain, lose consciousness, or request pain medication. Defendant did not decline to answer any questions and did not display any anger toward the officers. Defendant was not handcuffed, nor was he told that he could not leave or that he was under arrest.

**STATE v. ALLEN**

[200 N.C. App. 709 (2009)]

Further, defendant did not ask the officers to leave or request contact with his family members.[1]

While at the hospital, the officers present were notified that Franks had died. Detectives Michael Overton and Craig, and Officer Smith determined that they had probable cause to arrest defendant. After receiving treatment, defendant was advised that he was going to be transported to the Wilmington Police Department. Five officers were present when defendant was discharged. Defendant was not placed under arrest at that time, but he could not leave the hospital on his own. All of the challenged statements were made prior to defendant's transport to the police station. No statements were made during the transport.

The trial court entered nine findings of fact pertaining to the circumstances surrounding defendant's statements at the hospital, all of which were consistent with the evidence presented at the suppression hearing.

Considering the totality of the circumstances present while defendant was questioned in the hospital, we hold "these facts do not constitute 'custodial interrogation' since the atmosphere and physical surroundings during the questioning manifest a lack of restraint or compulsion." *Thomas*, 22 N.C. App. at 211, 206 S.E.2d at 393. Any restraint in movement defendant may have experienced at the hospital was due to his medical treatment and not the actions of the police officers. Evidence presented at the suppression hearing supports the trial court's findings of fact, which in turn support its conclusions of law that defendant was not in custody at the hospital. The trial court did not err by denying defendant's motion to suppress his hospital statements. This argument is without merit.

---

1. Defendant's argument largely focuses on the assertion that he was "prevented from seeing his family." However, defendant never requested to see his family. At the suppression hearing, defendant's mother testified that she attempted to see defendant several times while he was being treated, but that either Detective Overton or Officer Smith informed her that no one was allowed in that area. Defendant also asserts that Katrina Allen, defendant's sister, asked permission to see him when she first arrived. Hospital staff told her she would have to wait because nurses were putting in an IV. Katrina testified that officers arrived shortly thereafter and asked everyone to leave the room. Katrina once again sought permission to see defendant, but *a member of the hospital staff* denied this request, not police officers. However, this was Katrina's trial testimony and was not presented to the trial court during the suppression hearing. Defendant was never aware of his mother's or Katrina's requests to see him. We do not consider circumstances that a defendant is unaware of in determining whether a reasonable person in defendant's position would believe that they were under arrest or significantly restrained in their movement.

STATE v. ALLEN

[200 N.C. App. 709 (2009)]

## C. Statement at the Police Station

[2]  In his second argument, defendant contends the trial court erred by denying his motion to suppress his statement given at the police station arguing that it was wrongfully elicited after he had invoked his right to counsel. We disagree.

"Once an accused invokes his right to counsel during a custodial interrogation, 'the interrogation must cease and cannot be resumed without an attorney being present unless the accused himself initiates further communication, exchanges, or conversations with the police.'" *State v. Fisher*, 158 N.C. App. 133, 142, 580 S.E.2d 405, 413 (2003) (quotation and emphasis omitted), *aff'd per curiam*, 358 N.C. 215, 593 S.E.2d 583 (2004). Custodial interrogation "is not limited to express questioning by law enforcement officers, but also includes 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *State v. Golphin*, 352 N.C. 364, 406, 533 S.E.2d 168, 199 (2000) (quotation omitted), *cert. denied*, 532 U.S. 931, 149 L. Ed. 2d 305 (2001).

> Factors that are relevant to the determination of whether police "should have known" their conduct was likely to elicit an incriminating response include: (1) "the intent of the police"; (2) whether the "practice is designed to elicit an incriminating response from the accused"; and (3) "[a]ny knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion . . . ."

*Fisher*, 158 N.C. App. at 142-43, 580 S.E.2d at 413 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 302 n.7, 8, 64 L. Ed. 2d 297, 308 n. 7, 8 (1980)).

In its order denying defendant's motion to suppress, the trial court made the following unchallenged findings of fact pertaining to the circumstances leading up to defendant's statement at the police station:

> 10.  Once the defendant arrived at the Wilmington Police Department shortly before 6 p.m., he was ushered to an interview room which had video and audio facilities which recorded the events from the time he entered. The defendant was in custody under arrest at that time and was wearing handcuffs.

11. The defendant was advised, at least partially, of his *Miranda* rights by Detective Craig. No interrogation took place in the interview room prior to the reading of those rights. After being advised of his right to have an attorney present during questioning, the defendant advised Detective Craig that he wanted attorney Geoff Hosford present before he answered any questions.

12. As a result, [D]etective Craig left the interview room and attempted to call attorney Hosford. Several attempts to reach Hosford at his office were unsuccessful. An attempt to call Hosford's law partner to get a cell phone number was also not successful. A message with phone numbers to call was left on Hosford's answering service by [D]etective Craig.

13. While Craig was outside of the interview room during that fourteen minute period that followed the defendant's request for an attorney, Detective Craig spoke to District Attorney Ben David and Assistant District Attorney Jon David, who had arrived at the Wilmington Police Department, after being advised of the incident.

14. After speaking to the district attorney, Craig went back into the interview room. Immediately upon entry into the room, the following exchange took place:

Craig: You don't have Geoff's number or anything? I called his office. Of course, it's just an answering machine, I can't find find [sic] . . . I know where he lives, but I can't get 'ahold' of him.

Allen: I ain't got his cell phone.

Craig: Okay, well, right now, all right, I mean, I ain't trying to ask you questions, I'm trying to get 'ahold' of your attorney. Right now you're being detained. You're being charged with second degree murder.

Allen: He died? Huh?

Craig: Yes, he died. You're being charged with second degree murder, so just hold tight.

Allen: Wow. But listen, though. Well, can I talk to you . . . can I talk to you without him till tomorrow?

Craig: I mean, that's your right, partner. Okay? But you asked for him, so if you want to talk to me . . .

Allen: I'll talk to you right now.

Craig: Okay, you want to talk to me without your attorney present?

Allen: For right now.

Craig: All right. Hold tight.

[Craig leaves the room for approximately one minute and ten seconds. Upon reentering the room the dialogue continues]:

Craig: Now, just to reiterate . . .

Allen: Can I talk to you right now. I didn't know it was that bad.

Craig: Well, hold on. Before I can talk to you, I need to read you your rights again. I've got to make sure. You want to talk to me without your lawyer being present right?

Allen: For right now because you can't get in touch with him.

Craig: For right now this is what you want to do?

Allen: Right.[2]

15. The defendant was reread his Constitutional rights mandated by *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966) by Detective Craig from a written department form. . . . The defendant waived his rights and agreed to answer questions without his attorney being present.

. . .

16. The defendant during the approximate sixty-seven minutes of questioning by the officers described and demonstrated what occurred between him and the decedent during the early afternoon of July 26, 2006. . . .

In his brief, defendant concedes that he "does not dispute" any of the trial court's findings of fact on this issue. However, defendant argues that the act of telling him Franks had died "was an improper and deliberate attempt to elicit a response from [defendant], in violation of his Sixth Amendment right to counsel." This assertion mischaracterizes Detective Craig's conduct. As is recited above, Detective Craig reentered the interview room, informed defendant that they were un-

---

2. The trial court's recitation of the conversation between Detective Craig and defendant is an exact transcription of what appears on the recording submitted to this Court.

able to reach his attorney, and stated that defendant was being charged with second degree murder. This Court has held that merely stating the charges brought against a defendant does not equate to an "interrogation." *State v. Leak,* 90 N.C. App. 351, 355-56, 368 S.E.2d 430, 433 (1988). In *Leak,* the defendant was read his *Miranda* rights and he chose to invoke his right to counsel. *Id.* at 353, 368 S.E.2d at 432. The arresting officer then started to give the defendant copies of each warrant and began telling defendant the offenses with which he was charged. *Id.* While this occurred, the defendant stated that he wanted to tell his side of the story and made an inculpatory statement. *Id.* This Court held:

> defendant initiated the further communication. The only statements by the officer concerned the nature of the charges against defendant. These statements cannot be said to be an interrogation for " 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (*other than those normally attendant to arrest and custody*) that the police should know are reasonably likely to elicit an incriminating response from the suspect."

*Id.* at 355-56, 368 S.E.2d at 433 (quotation omitted). The facts of the instant case are materially indistinguishable from those presented in *Leak.* Defendant initiated the communication with Detective Craig. Therefore, defendant's argument that Detective Craig wrongfully elicited a response after he had invoked his right to counsel is without merit.

### III. Flight Instruction

**[3]** In his third argument, defendant contends the trial court erred by instructing the jury on flight. We disagree.

"[O]ur courts have long held that a trial court may not instruct a jury on defendant's flight 'unless there is some evidence in the record reasonably supporting the theory that defendant fled after commission of the crime charged.' " *State v. Levan,* 326 N.C. 155, 164-65, 388 S.E.2d 429, 433-34 (1990) (quotation and citation omitted). "[M]ere evidence that defendant left the scene of the crime is not enough to support an instruction on flight. There must also be some evidence that defendant took steps to avoid apprehension." *State v. Westall,* 116 N.C. App. 534, 549, 449 S.E.2d 24, 33, *disc. review denied,* 338 N.C. 671, 453 S.E.2d 185 (1994). Our Supreme Court has held that "[e]vidence that the defendant hurriedly left the crime scene without

**STATE v. ALLEN**

[200 N.C. App. 709 (2009)]

rendering assistance to the homicide victim may warrant an instruction on flight." *State v. Taylor,* 362 N.C. 514, 540, 669 S.E.2d 239, 262 (2008) (citation omitted).

Immediately after defendant stabbed Franks, defendant fled the area and ran towards 8th Street. Defendant did not render any assistance to Franks before he fled. Detective Overton's police report states that defendant told him that he "threw his knife away as he ran from the scene." Investigating officers found an open "folding knife" in a storm drain located near the crime scene. We hold this evidence was sufficient to support the theory that defendant fled the scene to "avoid apprehension" after he stabbed Franks.

Even assuming *arguendo* there was insufficient evidence in the record to support a flight instruction, defendant must still demonstrate that the instructional error was prejudicial. *See State v. Glynn,* 178 N.C. App. 689, 693, 632 S.E.2d 551, 554, ("[I]t is not enough for the appealing party to show that error occurred in the jury instructions; rather, it must be demonstrated that such error was likely, in light of the entire charge, to mislead the jury." (quotation omitted)), *disc. review denied and appeal dismissed,* 360 N.C. 651, 637 S.E.2d 180 (2006). In light of the overwhelming evidence presented at trial that defendant was the perpetrator responsible for Franks's death, including his confession at the police station and his testimony at trial, defendant cannot demonstrate that any error in the trial court's instruction to the jury was prejudicial. This argument is without merit.

## IV. Sentencing Hearing

[4] In his fourth argument, defendant contends the trial court erroneously considered the fact that defendant rejected a plea offer when determining his sentence. We disagree.

"If the record discloses that the court considered irrelevant and improper matter in determining the severity of the sentence, the presumption of regularity is overcome, and the sentence is in violation of defendant's rights." *State v. Johnson,* 320 N.C. 746, 753, 360 S.E.2d 676, 681 (1987) (quotation omitted). "Where it can reasonably be inferred *from the language of the trial judge* that the sentence was imposed at least in part because defendant did not agree to a plea offer by the [S]tate and insisted on a trial by jury, defendant's constitutional right to trial by jury has been abridged, and a new sentencing

hearing must result." *State v. Cannon*, 326 N.C. 37, 39, 387 S.E.2d 450, 451 (1990) (emphasis added).

Defendant's argument centers on a portion of the prosecutor's comments during defendant's sentencing hearing. Several times during the hearing, the prosecutor mentioned defendant's failure to accept the State's plea offer and requested the trial court sentence defendant "in the high end of the presumptive range for a B-2 felony which is 251 months minimum to 311 months maximum." When the prosecutor first stated that the State had offered defendant a plea, defense counsel objected and the trial court overruled that objection. On this basis alone, defendant argues the trial court took defendant's rejection of the plea offer into consideration when determining his sentence. However, it is well-established that the trial court is presumed to disregard incompetent evidence when rendering its decisions. *See generally State v. Allen*, 322 N.C. 176, 185, 367 S.E.2d 626, 631 (1988) ("The presumption in non-jury trials is that the court disregards incompetent evidence in making its decision.").

Further, the trial court did not make any comments pertaining to defendant's rejection of the plea offer. After hearing both parties' arguments, the trial court found defendant to be a prior record level IV and sentenced him within the presumptive range to an active prison sentence of a minimum of 240 to a maximum of 297 months, a lower sentence than was requested by the State. No other comments were made. It is well-established that where the trial court sentences a defendant within the presumptive range there is a rebuttable presumption that the sentence is valid. *Johnson*, 320 N.C. at 753, 360 S.E.2d at 681.

Defendant also argues the trial court should not have imposed such a high presumptive range sentence based on the presence of several mitigating factors. However, "a trial court is not required to justify a decision to sentence a defendant within the presumptive range by making findings of aggravation and mitigation." *State v. Campbell*, 133 N.C. App. 531, 542, 515 S.E.2d 732, 739, *disc. review denied*, 351 N.C. 111, 540 S.E.2d 370 (1999); *see also* N.C. Gen. Stat. § 15A-1340.16(c) (2007) (providing that "[t]he court shall make findings of the aggravating and mitigating factors present in the offense only if, in its discretion, it departs from the presumptive range of sentences specified in G.S. 15A-1340.17(c)(2)."). In its discretion, the trial court sentenced defendant in the presumptive range regardless of any mitigating factors present. Defendant is not entitled to a new sentencing hearing. *See Johnson*, 320 N.C. App. at 753, 360 S.E.2d at

681 (holding that where "the record reveals no such express indication of improper motivation" in sentencing a defendant, a new sentencing hearing is not warranted). This argument is without merit.

NO ERROR.

Judges McGEE and JACKSON concur.